UNITED STATES *v.* McNINCH, DOING BUSINESS AS
HOME COMFORT CO., ET AL.

No. 146.   Argued April 1, 1958.—Decided May 26, 1958.

*Assistant Attorney General Doub* argued the cause for
the United States.   With him on the brief were *Solicitor
General Rankin* and *Samuel D. Slade.*

*A. C. Epps* and *Edwin P. Gardner* argued the cause for
respondents.   On the briefs were *Mr. Epps* and *Charles
W. Laughlin* for Cato Bros., Inc., et al., and *Mr. Gardner*
and *Edward W. Mullins* for McNinch et al., respondents.

MR. JUSTICE BLACK delivered the opinion of the Court.

This case was argued with *Rainwater* v. *United States,
ante,* p. 590, also decided today.   It involves three sepa-
rate actions by the Government to recover damages and

forfeitures under the False Claims Act.[1] These actions—which will be referred to, after the principal defendant in each instance, as *Cato, Toepleman* and *McNinch*—were initially brought in different Federal District Courts but on appeal were disposed of by the Court of Appeals in a single opinion. 242 F. 2d 359.[2]

In *Cato* and *Toepleman* the District Court found the defendants had submitted false claims for crop support loans to the Commodity Credit Corporation, and entered judgment in favor of the Government for the forfeitures provided by the False Claims Act. The Court of Appeals reversed on the ground that a false claim against Commodity was not a claim "against the Government of the United States, or any department or officer thereof" within the meaning of that Act. The sole question before us, so far as these two actions are concerned, is whether the Court of Appeals erred in so deciding. For the reasons set forth in *Rainwater* we hold that it did.

*McNinch* raises different questions concerning alleged false claims against the Federal Housing Administration. By statute the FHA is authorized to insure qualified banks and other private lending institutions against a substantial portion of any losses sustained by them in

---

[1] R. S. §§ 3490, 5438 (1878), which are set out in note 1, *Rainwater* v. *United States, ante,* p. 590.

[2] In *Cato* the suit was filed in the Eastern District of Virginia. The defendants were Cato Brothers, Inc., a Virginia corporation, and Wilfred Cato, William Cato and Magie Stone, all directors and officers of the corporation. *Toepleman* was brought in the Eastern District of North Carolina. Named as defendants were Frederick Toepleman and Garland Greenway, as individuals and partners. After trial, the District Court exonerated Greenway and he is no longer involved. In *McNinch* the action was instituted in the Eastern District of South Carolina. The defendants were Howard McNinch, Rosalie McNinch and Garis Zeigler.

lending money for the repair or alteration of homes.[3] After a lending institution has been approved by the FHA that agency promises to insure, upon payment of a specified premium, any home improvement loan made by the institution. A borrower desiring to obtain an insured loan applies directly to the private lender, which has final authority to decide whether the loan should be made. If a loan is granted, the lender reports the details to the FHA which automatically insures the loan as soon as the required premium is paid.

The Government's complaint in *McNinch* charged the defendants with causing a qualified bank to present a number of false applications for credit insurance to the FHA.[4] The defendants moved to dismiss the complaint, asserting that it failed to state a cause of action. The District Court granted the motion, holding that an application for credit insurance was not a "claim" within the meaning of the False Claims Act. The Court of Appeals affirmed on that same basis as well as on the alternative ground that a false claim against the FHA was not a claim "against the Government of the United States, or any department or officer thereof."

---

[3] In general see 48 Stat. 1246, as amended, 12 U. S. C. § 1701 *et seq.;* 24 CFR §§ 200.2–200.3, 201.1–201.16.

[4] In somewhat greater detail the complaint made the following assertions: The defendants Howard and Rosalie McNinch were officers of an unincorporated home construction business and the defendant Zeigler was one of their salesmen. The defendants presented several applications for FHA-insured loans to a qualified bank. The loans were sought on behalf of homeowners for the purpose of financing residential repairs and improvements which the business had contracted to make. The applications contained statements misrepresenting the financial eligibility of the homeowners and were accompanied by fictitious credit reports. The bank, relying on this false information, granted the loans which in turn were routinely insured by the FHA.

1. In our judgment the Court of Appeals quite plainly erred in holding that the FHA was not part of the "Government of the United States" for purposes of the False Claims Act. The FHA is an unincorporated agency in the Executive Department created by the President pursuant to congressional authorization. Its head, the Federal Housing Commissioner, is appointed by the President with the Senate's consent, and the powers of the agency are vested in him. The agency is responsible for the administration of a number of federal housing programs and operates with funds originally appropriated by Congress. In short, the FHA is about as much a part of the Government as any agency can be.

2. Although the problem is not easy, we believe the courts below were correct in holding that a lending institution's application for credit insurance under the FHA program is not a "claim" as that term is used in the False Claims Act. We acknowledge the force in the Government's argument that literally such an application could be regarded as a claim, in the sense that the applicant asserts a right or privilege to draw upon the Government's credit. But it must be kept in mind, as we explained in *Rainwater*, that in determining the meaning of the words "claim against the Government" we are actually construing the provisions of a criminal statute.[5] Such provisions must be carefully restricted, not only to their literal terms but to the evident purpose of Congress in using those terms, particularly where they are broad and susceptible to numerous definitions. See *United States ex rel. Marcus* v. *Hess,* 317 U. S. 537, 542; *United States* v. *Wiltberger,* 5 Wheat. 76, 95–96.

In normal usage or understanding an application for credit insurance would hardly be thought of as a "claim

---

[5] See note 8, *Rainwater* v. *United States, ante,* p. 592, and the text at that point.

against the Government." As the Court of Appeals for the Third Circuit said in this same context, "the conception of a claim against the government normally connotes a demand for money or for some transfer of public property." *United States* v. *Tieger,* 234 F. 2d 589, 591. In agreeing to insure a home improvement loan the FHA disburses no funds nor does it otherwise suffer immediate financial detriment. It simply contracts, for a premium, to reimburse the lending institution in the event of future default, if any.[6]

The False Claims Act was originally adopted following a series of sensational congressional investigations into the sale of provisions and munitions to the War Department. Testimony before the Congress painted a sordid picture of how the United States had been billed for nonexistent or worthless goods, charged exorbitant prices for goods delivered, and generally robbed in purchasing the necessities of war.[7] Congress wanted to stop this plundering of the public treasury.[8] At the same time it is equally clear that the False Claims Act was not designed to reach every kind of fraud practiced on the Government. From the language of that Act, read as a whole in the light of normal usage, and the available legislative history we are led to the conclusion that an application for credit insurance does not fairly come within the scope that Congress intended the Act to have.[9] This question has

---

[6] Since there has been no default here, we need express no view as to whether a lending institution's demand for reimbursement on a defaulted loan originally procured by a fraudulent application would be a "claim" covered by the False Claims Act.

[7] See, *e. g.,* H. R. Rep. No. 2, Part 2, 37th Cong., 2d Sess.

[8] Cong. Globe, 37th Cong., 3d Sess. 952–958.

[9] The manager of the bill in the Senate stated its objective as follows:

"I will simply say to the Senate that this bill has been prepared at the urgent solicitation of the officers who are connected with the

now been considered by the Courts of Appeals for the Third, Fourth, and Fifth Circuits, as well as by District Courts in those circuits, and all have reached the same conclusion.[10]

The judgment of the Court of Appeals is affirmed in *McNinch* and reversed in *Cato* and *Toepleman* and the cause is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

---

administration of the War Department and Treasury Department. The country, as we know, has been full of complaints respecting the frauds and corruptions practiced in *obtaining pay from the Government* during the present war; and it is said, and earnestly urged upon our attention, that further legislation is pressingly necessary to prevent *this great evil;* and I suppose there can be no doubt that these complaints are, in the main, well founded. From the attention I have been able to give the subject, I am satisfied that more stringent provisions are required for the purpose of punishing and preventing *these frauds;* and with a view to apply a more speedy and vigorous remedy in *cases of this kind* the present bill has been prepared." (Emphasis added.) Cong. Globe, 37th Cong., 3d Sess. 952.

Apparently there were no committee reports nor any record of the proceedings in the House.

[10] See *United States* v. *Tieger,* 234 F. 2d 589, cert. denied, 352 U. S. 941; *United States* v. *Cochran,* 235 F. 2d 131, cert. denied, 352 U. S. 941.

Although offered in a somewhat different context the statement of the Court in *United States* v. *Cohn,* 270 U. S. 339, 345–346, also has relevancy here:

"While the word 'claim' may sometimes be used in the broad juridical sense of 'a demand of some matter as of right made by one person upon another, to do or to forbear to do some act or thing as a matter of duty,' *Prigg* v. *Pennsylvania,* 16 Pet. 539, 615, it is clear, in the light of the entire context, that in the present statute, the provision relating to the payment or approval of a 'claim upon or against' the Government relates solely to the payment or approval of a claim for money or property to which a right is asserted against the Government, based upon the Government's own liability to the claimant."

Mr. Justice Douglas, concurring in part and dissenting in part.

I agree with the Court as respects the false claims made against the Commodity Credit Corporation. I disagree as to the claims against the Federal Housing Administration. The allegations are that McNinch and others, having contracted to make alterations and improvements in various homes, presented to a South Carolina bank several fraudulent loan applications. The applications were accompanied by fictitious credit reports and misrepresented the financial eligibility of the homeowners. These loan applications were made with the intent that they be accepted by the Federal Housing Administration for insurance.[1] These are the allegations, which for present purposes we must assume are correct.

---

[1] The Federal Housing Commissioner is empowered to insure qualified lending institutions against losses sustained as a result of loans made by them for the purpose of financing alterations, repairs, and improvements upon or in connection with real property, 48 Stat. 1246, as amended, 12 U. S. C. § 1703 (a). Under the Regulations (24 CFR §§ 200.2–200.3) a lending institution is first approved by FHA to grant loans eligible for insurance and is given a contract of insurance under which the FHA in general agrees to indemnify the insured against losses sustained by it up to an aggregate amount equal to 10% of the total sums advanced by the institution in eligible loans and reported to FHA for insurance. A borrower desiring to obtain a loan makes application to the lending institution, either directly or through contractors, on an FHA form which provides for the disclosure of certain information, 24 CFR § 200.3 (a). Within 31 days after the loan is made, the lending institution must report the details of the loan transaction to the FHA on an agency form provided for that purpose, 24 CFR § 200.3 (c). After the details of the transaction have been reported to it, FHA computes the insurance premium which will be due and payable by the lending institution, records the transaction, and acknowledges the loan for insurance. Ibid.

The South Carolina bank had been approved by FHA as a lending institution. The bank approved the requested loans and applied to FHA for insurance. FHA insured the loans. Thereupon the proceeds of the loans were deposited to the accounts of these respondents in the South Carolina bank.

The statute, R. S. §§ 3490, 5438, 31 U. S. C. § 231, covers anyone who fraudulently "makes or causes to be made, or presents or causes to be presented, for payment or approval . . . any claim" against the United States. No claim has been tendered against the United States for "payment." But a claim has been presented for "approval" in the meaning of the Act. For the United States has been induced by fraudulent representations to insure these loans. One who has the endorsement of the United States on his paper has acquired property of substantial value. It is a property right of value because it represents a claim against the United States. It is of course contingent until a default occurs. But when fradulent, it represents an effort to "cheat the United States" (*United States ex rel. Marcus* v. *Hess,* 317 U. S. 537, 544) to the extent that the United States underwrites the losses on the loans. The fact that precise damages are not shown is not fatal, as *Rex Trailer Co.* v. *United States,* 350 U. S. 148, 153, holds.

This cheating of the United States is as real, as substantial, and as damaging as those specific abuses against which the managers of this legislation railed when it was before the Congress.[2] We do not have to stretch the law to include this type of "claim," as this form of insurance is a well-recognized property interest. See *Fidelity & Deposit Co.* v. *Arenz,* 290 U. S. 66. The obtaining of

---

[2] Cong. Globe, 37th Cong., 3d Sess. 952 (1863); and see H. R. Rep. No. 2, 37th Cong., 2d Sess.

credit risk insurance from the Government by fraudulent means is a form of plundering as flagrant as the presentation for "payment or approval" of any other type of claim against the Treasury. As Judge Rives said in his dissent in *United States* v. *Cochran,* 235 F. 2d 131, 135, "Inducing the Government to pledge its credit by a false and fraudulent claim" is as much within the Act as "inducing it to part with its money or property."